We have talked about some of these things before, haven't we? Yes, we have, Your Honor. You may proceed. May it please the Court. There are two issues before the Court in this case, one dealing with exchanges and the other dealing with the mandate rule. And within the mandate rule issue, there are three, I guess, different issues that are on appeal. Did our decision, our recent decision in Dairyland put an end to some of the arguments in this case? It certainly affects it, Your Honor. For the record, though, I would like to – I think the issue is still live from our perspective, both for this case but also to ensure that if we decide to take any further review of this particular issue, I want to make sure our position is clear with regard to it. Dairyland did decide as a matter – looked at the exchanges issue as a matter of fact and said – looked at our appeal as a factual challenge and decided that on the facts of that case, there was not clear error in the judge's decision to accept Mr. Graves' model. We are not here arguing that Mr. Graves' model is inherently different in terms of the types of defective assumptions that he made in the model there versus in this case. I mean, the models are pretty similar. The assumptions are the same, yeah. However, I do want to make clear, we are appealing not only from a factual issue, but as a matter of law, we believe this model is inappropriate in these cases in the circumstances we have here. In particular, we have a model – we have this kind of argument – You don't think the Dairyland court's blessing of the assumptions he made in his model before prevents us from rejecting those same assumptions in this case? Well, I will just point to the Union Electric decision from this court, which is 363, Feb. 3, 1292, where the court said the disposition of an issue by an earlier decision does not bind later panels of this court unless the earlier opinion explicitly addressed and decided the issue. And the one issue I'm going to mention where I don't think the court addressed it was our legal challenge that in the context of these cases where the government had previously asked the court to consolidate this rate issue, the allocation issues, into a consolidated proceeding so we in one proceeding could have all the utilities together and have these allocations decided on a uniform basis, where the trial court rejected that and just sent it to the individual judges to decide, it is inequitable and unfair to the government then to basically be placed in a position where there are inconsistent decisions being made with different judges about each utility and what allocations they get. For example, in this case, Mr. Graves assumes that lots of utilities would be trading away their rights. They wouldn't be using them because they wouldn't need them because they're operating reactors. Yet in other cases where we have operating reactors, they argue that, oh, yes, we would in fact use our allocation and therefore our damages should be based upon the fact that we needed that allocation. One specific example is the Northern States trial court case where the trial court judge found they needed their first allocation to avoid having to build dry storage on site. In Mr. Graves' model, he assumes that that utility would be willing to trade away their first year rights. In the context of these cases where we have a specific set of plaintiffs, all of whom have sued the government in the Court of Federal Claims, to have the government subjected to this type of duplicative liability where the government is paying for different plaintiffs for using the same allocation... ...with its evidence, and we can't just say, well, because in another case the same argument was made and they couldn't be exchanging with everyone, everyone couldn't be exchanging, we can't disregard that. We have this case to decide where there's good evidence that there would have been these exchanges. Well, there are assumptions. The only evidence were Mr. Graves' assumptions about what utilities would do. But those are logical assumptions and they seem to be supported by the but-for world and by economic reality, yes. Well, he didn't... They would have picked up the fuel in the same locale and it would have been logical and economic to do so. Well, I don't want to step into Dairyland's findings too much, but the assumptions here that Mr. Graves made were made without any kind of survey of the industry and without actually talking to industry or utilities. These are assumptions he made from economic theory. But that's something that Dairyland's pretty much decided for us, right? The exchanges model is in the contract and it's properly applied by Mr. Graves. The legal issue that we want to make sure we preserve here is the one that where we have, you know, there may be some factual findings here and yet where they are inconsistent, there's a factual finding about northern states. I was here in Dairyland, you made exactly the same argument. The court proceeded. I want to ensure, though, that we preserve. This is also a legal issue. It is preserved. Thank you, Your Honor. You can make that argument again. Let me talk about the mandate rule issues. There are three specific issues within the sort of mandate rule challenge, two by the government and one by the plaintiff. Two of them, I think, you know, we have to ask the court what it meant by its mandate. One is with regard to GTCC waste and one is with regard to the wet pool storage costs. This court reviews the trial court's review of its mandate de novo for the obvious reason that this court is in the best position to know what it meant by its mandate. On GTCC waste, the Court of Federal Claims made, as I understood its opinion, two holdings. One was related to the mandate rule, but then I also understood when this issue only, the Court of Federal Claims may have made a separate holding that says the GTCC waste would not alter the Yankees' fuel outdates. They made a factual determination that the addition or the factoring in of the GTCC waste would not change the fuel outdates. So you'd have to establish that was clearly erroneous in addition to the mandate rule being wrong. My understanding of what the trial court did, and if I'm wrong, I apologize, my understanding was that it found that DOE would in fact not add GTCC to the queue, but in fact would add it on top, would accept it in addition to the queue. Under the oldest fuel first, oldest fuel slash waste first allocation method, the age of the fuel or waste is based upon the date that it's removed from a reactor. Here, the GTCC that would have been removed from the Yankees would be, the age would be determined by the date of removal, which would have been sometime in the 1990s. Am I wrong? Didn't the court of federal claims make the determination that it wouldn't have affected the fuel outdates? To the extent that it made that finding, we... Or did it make that finding? Not to the extent that... I'm not aware of that, Your Honor, but I'm not aware of that. My understanding is that that finding was based upon the idea that you would just add GTCC on top of the rate rather than trying to create a queue including GTCC. And even if it did do that, Your Honor, the outdate for GTCC would have to be determined based upon the date of removal. The trial court never identified that, what that outdate would be, and included in Mr. Graves' exchange's model to determine whether... Just to clarify, so this is a quote from the trial court's opinion. It's in the red brief at page 59, but it's a quote from the trial court's opinion. GTCC generated from shutdown reactors was statistically insignificant and would not have had an appreciable effect on the SNF queue. And then they have several pages explaining why this factual finding could be affirmed regardless of what we do with the mandate rule. I understand, Your Honor. And the issue that we have with that type of statement is that even if it changes it just... or allocations to the next year, that's potentially an extra year of onsite storage for a particular utility, and that could be $10 million of cost shifting in terms of who recovers costs or who has to cover those costs. So from that standpoint, even an insignificant change could have... How come the government has never come up with a competing model then? I mean, you're saying even an insignificant change could affect the dollar value. Sure, insignificant doesn't mean nil. It means insignificant, and we are talking about astronomically large numbers here. So even an insignificant shift is more than I make in a year. I'm sure of it. But that being said, why didn't the government come up with some contrary evidence then? Why didn't you come up with something that said, look, it's not insignificant. Here's how much money it is. I mean, this is a finding of fact, and for me to say it's clearly erroneous in the light of no contrary evidence of any kind is very difficult. Your Honor, our information about GTCC and the outdates for GTCC from the nuclear reactors is sketchy, and therefore we don't have the ability to necessarily create a perfect model. Or any at all, though. I mean, you had nothing competing with Graves, right? So at no point in time did you ever give this court anything to consider other than what the nuclear power companies came forward with. Well, our uniform position has been that it is the plaintiff's burden to identify and create the but-for world and to create the model that needs to work for them. Well, why don't I let you move on to the mandate rule with regard to the cask-loading crane updates? Sure. That's a different issue, mandate rule. The plaintiff does not argue that, in fact, this court's rate determination affected that. What it argues is that there was a change in law through Carolina Power that allowed the court to reopen the cask and crane upgrade issue and to allow the Yankees to withdraw their concession in the first go-round. So they conceded this from the very get-go. There's never been a live dispute. Not before the remand. So the Yankees have never identified why, although they've said there's a change in law in Carolina Power that somehow affected things, they never identified why they themselves did not raise and press this argument in the first instance and why on remand they are then entitled to raise a new issue that, in fact, had been conceded before. Well, the logic of their brief suggests that our court has cautioned basically in favor of exactly what you're asking for, which is some degree of uniformity in the application of these cases. And so in their brief, what the trial court seems to have cited was the notion that, yes, they may not have raised this argument and may not have been otherwise entitled to it in absent other events, but with Carolina Power instructing us, make these cases uniform, give everybody the same thing. Let's not come up with these distinctions that make it very difficult to enforce. I think that's at least the logic I understood from the trial courts. Two quick responses, Your Honor, as I'm eating into my rebuttal time. One, in Tronzo, from the decision of this court, this court listed the reasons that issues like this shouldn't be raised for the first time on remand. And that is so basically to ensure full litigation in the first go-around, so issues aren't sort of coming up to this court and then expanding when they go back down, that there is a narrowing of issues as they come up and go back again, instead of an expansion of issues, so that the parties basically are narrowing down what's in dispute. That's certainly the basis for the mandate rule. Yes. The second point I would make is, the description of Carolina Power, even if it would provide a basis for reopening a new issue or withdrawing this concession on remand, if it provided that kind of basis, Carolina Power doesn't do what the Yankees say it does. It's not the substantial change in law that a few cases have found allow the mandate rule to be sort of accepted. Carolina Power dealt with the cask loading issue, where the plaintiff removed casks from its pool into dry storage, and the trial court had found that, well, when DOE finally comes, they will still have to generally put the things back in the pool and remove them again, so those costs are deferred. Here we have a shutdown reactor who doesn't have a pool anymore. These casks have been removed, the pool's been shut down. We're not going to have the situation like in Carolina Power, where these casks go back in the pool and those costs are incurred. Either these costs are the same that would have been incurred had DOE performed, or these are costs that are now avoided because there's no way to put them back in the pool. Also, with regard to Carolina Power, Carolina Power had nothing to do with crane upgrades. There wasn't a crane issue there, and this court's recent decision in Energy Northwest seems to indicate that it is the plaintiff's burden to establish that, in fact, plant modifications would not have been incurred in the but-for world. I would like to reserve my remaining time for rebuttal if I could, Your Honor. Thank you. Ms. Stetson? Good morning, Your Honors, and may it please the Court. Kate Stetson for the Yankee Utilities. I'm happy to speak to the dairy land issues. I do agree with Mr. Lester that dairy land certainly affects this determination on exchanges. We would say it resolves the issue on exchanges. Every single one of the government's arguments in this case was made and rejected in dairy land. So if the Court has questions, I'm happy to answer them. Going to the Carolina Power case, does that reopen the mandate here? Does it reopen the mandate with respect to the loading and crane upgrade costs? Yes. Judge Merrow concluded that it did. And I think that the starting point for the upgrade and loading costs issue is that, you know, we've all understood, as Mr. Lester pointed out, that this issue wasn't raised below. In fact, the Yankees took a conservative approach to their damages calculus back in 2004, before Indiana-Michigan, before Yankee, before Carolina Power, and concluded that because these costs would be incurred at some point in the future, they should be offset. Of course, then Indiana-Michigan comes along in 2005 and says the Yankees may not claim future damages. The Yankee case, which came down in 2008, says just as the plaintiffs can't claim future damages, so cannot the government claim future costs. Carolina Power, of course, on loading costs specifically made that holding. So what the trial court did in this case was to make what this court in Tronso called the prudential discretionary decision that he would, as he put it, permit the Yankees to rescind that earlier concession. That is a discretionary decision, and there is no abuse of that discretion based on Carolina Power and Yankee. So the crane upgrade and the loading costs... But was there any law that existed that would have suggested that you couldn't have sought the cask loading and crane upgrades? So for you to say there's a substantial change in the law implies that the law was the opposite way beforehand, and that's what I don't see. I don't see any cases that preexisted Carolina Power that would have given you reason to believe you shouldn't pursue those charges... That's right. ...as part of your damage calculation. That's right, Judge Moore. And as I said, the Yankee utilities back in 2004, when everyone understood that we were all in the market for both current and future costs, thought that this was an appropriate offset. But you're right, I can't point you to a pre-Carolina Power case that held the opposite. But what I can point you to, again, is Tronso, which says that once we are in this prudential and discretionary area where there are certain exceptions to the mandate rule, the trial judge, the judge with responsibility for his docket, his processes on remand, made the determination that this particular increment of damages, an increment that has been not offset at this point in all of the other utility cases, could be appropriately restored, again, in order to keep conformity with the rest of the cases, which is an important consideration, I think, in these cases among all others. So with respect to crane loading and crane upgrade and loading costs, I think that's where the exception, one of them, to the mandate rule comes in. But turning to GTCC and, Judge Moore, to your question about the alternative holding, there actually were two alternative holdings. Joint Appendix 47 is the first of them. And this is where the trial court, citing, among other things, the Federal Circuit's opinion in the first Yankee case, concludes that the high-level waste of which GTCC is a part was additional and would not replace spent nuclear fuel in the queue. I'd also point you to two aspects of the Federal Circuit's decision in the Yankee case. The first is 536F3 at 1277. GTCC does not qualify as SNF, full stop. 536F3 at 1278. What's the basis for the trial court's conclusion in this instance? Just that there's so little of it that it will just go along with the other easily? Or what's the point? No, I think, Judge Rader, that actually goes more to the second of the two alternative holdings. The basis for the court's first conclusion is at Appendix 6176, among other things, in addition to the Federal Circuit's prior ruling. This is the 1987 Mission Plan Amendment. And if you look at that page of the joint appendix, what you'll see is that high-level waste is actually broken out as a separate pickup amount for certain pickup years. And what the trial court concluded, and again, as Judge Moore pointed out, this is a factual question, was that that indicated that high-level waste was not meant to be incorporated into the spent nuclear fuel queue. After all, GTCC is not measured in MTUs. It's measured in something else. It was meant to be picked up alongside the queue. That's alternative holding number one. Alternative holding number two is the one that Judge Moore pointed out already, which is that the court also found, at Joint Appendix 48 to 49, that the amount of GTCC we're talking about was statistically insignificant. This, too, is supported by ample record evidence. We pointed it out at great length in our brief. Among other things, Joint Appendix 2160, where the former director of the Office of Civilian Radioactive Waste Management points out that we're talking about 1% of overall waste from nuclear plants is GTCC waste. So with respect to the GTCC issue, you don't even need to embark on the inquiry about whether or not GTCC itself was within or outside the mandate rule because there are these two independent alternative factual findings that the trial judge made to support his ruling below. If there are no further questions on GTCC, I'll turn to the third of the three, and this is our cross-appeal on wet pool. The wet pool issue actually is, I think, the purest mandate rule question in the case. I'll tell you, I think you've got a better case for wet pool than you do for cask loading and crane upgrades since you conceded those. I mean, this is what I'm really not comfortable yet with the cask loading and crane upgrade charges. Like I said, I think you have a better case for wet pool. So you can choose which one you want to talk about. Well, let me just say this again on upgrades and loading. We all agree. We concede that we conceded it below. But what Judge Marrow did was exercise his discretion to restore those offsets. You conceded it without any case law that suggested you had to. You conceded it simply to narrow the issues that you would have in dispute in your case as a matter of trial strategy. When that is the purpose behind your concession, it makes it difficult for me to suggest the mandate rule. There should be an exception carved out to it when a new case comes along that says somebody gets it. You could have asked for it. You were aware of the issue. You made the concession. You chose not to fight that battle on that front. Maybe a good trial strategy, totally understandable. Right. But it wasn't as a result of preexisting precedent. There was nothing that made you believe you had to concede those other than your own choice. That's true. But Judge Marrow, on remand, in his discretion, looked at this increment of costs, understood that, as this court said in Carolina Power, one of the objectives to this sprawling series of cases is to try to maintain uniformity across results. And this was an aberrational result because this was a case where loading and upgrade costs were not offset. Well, uniformity among results when people are pleading common issues. But just because somebody else gets something, if you never asked for it, we don't go back and give it to you anyway. That was exactly what the utility in Carolina Power did. It was exactly what the government argued in Carolina Power. The government in that case said, well, this utility didn't press the 1987 rate in the trial court, and it could have. There was certainly nothing precluding it from pressing the 1987 rate. And this court said, we're not going to penalize that utility for failing to press that rate when the rest of the industry at that point had caught up with it, and there was this subsequent precedent directing that that rate be used. That's exactly why that got remanded. And that's the analogy that this judge, again in his discretion, drew to Carolina Power. Well, you've wisely pointed to our standard of review, which is abuse of discretion probably a dozen times. So tell me why we should conclude then that the lower court abused its discretion on the wet pool issue. You've made it very clear what an incredibly high burden this is. Because this is a different standard of review. As both of us agree, both the government in its blue brief and ours in the red, when you're interpreting the scope of the mandate in the first instance, it's a question of law. The trial court had no more ability, in fact, less ability, I would submit, than you all, to determine what the mandate said in the first case. Now, what Judge Merrow thought the mandate said with respect to cost was this, that the remand was one for reexamination of causation for discrete costs previously awarded. That's Judge Merrow's words. What this court actually said was that the case was remanded for application of the 1987 rate to assess costs, not discrete costs, not isfasy and re-racking, but the Yankees' costs. And just to give a very practical example of the effect of excluding these wet pool costs, and again, we're talking about Yankee Atomic 2000 and 2001 wet pool costs from review on remand. The trial judge now has found, as a matter of fact, that the Yankee Atomic wet pool would have been emptied by 1999. That is its 2010 ruling. So what you have now is a 2010 factual finding that Yankee Atomic's wet pool would have been empty in 99, and then you have this little pocket of a finding left over from 2006 that says Yankee Atomic still would have had fuel in its pool in 2000 and 2001. That makes no sense. The reason that you can tell that the remand was meant to do more than just assess isfasy and re-racking is exactly because of that sort of practical and logical infirmity between those two results. That's the reason that the mandate was, we think in this instance, too narrowly interpreted. That's not a discretionary issue. That's a de novo review issue, and it's one that in this instance the trial judge went the wrong way on. If there are no questions on wet pool or other mandate issues, I'm happy to reserve the remaining time for rebuttal. Thank you, Ms. Stetson. Thank you. Mr. Lester. Very briefly, Your Honor. On the cask crane issue, Tronzo at page 1349 of that decision talks about the circumstances, exceptions to the mandate rule need to be exceptional. A substantial change in the law, although I'm not aware of any decisions of this court that say a change in law affected the McCrimmon case in the Fifth Circuit, talks about certain exceptions, talks about substantial change in law. We don't have that here. And although counsel for Yankees talked about an abusive discretion standard, not aware of an abusive discretion standard applying to that, Tronzo talks about this court's ability to determine whether or not mandate should apply or not or change. I'm not sure that abusive discretion is the proper standard there. Do you think their case is weaker on this point, or do you think it's irrelevant that it was a concession made up front as opposed to something that maybe they have fought and lost and then not appealed? I don't know that it matters, Your Honor. On the web pool issue, which I think you're referring to, is the government— Well, I was actually referring to the crane issue because I'm thinking it bothers me that they never raised the issue in a vacuum of precedent on the board. Well, and in addition, I mean, with regard to that, you know, in addition, this court remanded for causation. There are also foreseeability issues with regard to the costs that were never challenged before, the findings the court never made. What I also find a bit perverse is they didn't get the thing they're really probably entitled to, right, the 2000-2001 web pool. You're not even saying they're not entitled to it. You're saying mandatory prevents giving it to them. So they didn't get the thing that they are entitled to, but then they got the thing that they won't actually incur costs for later on, as you explained, because the web pool's gone now. It's all done. So it's a very strange splitting of the baby in my mind. And just on the web pool cost, we just mentioned the plaintiff elected not to appeal that issue before. The web pool issue was not before this court. Did this court accept jurisdiction over the web pool issue when it remanded? Our position is no. We'd ask the court to reverse and affirm in the manner set forth in our brief. Thank you. Okay. Thank you, Mr. Lester. Ms. Detson, just on the cross-poll? Correct. With respect to the web pool, I just want to point out this. Judge Merrow very carefully and thoughtfully concluded that if he was wrong about his interpretation of the scope of the mandate, that it applied not only to discrete costs previously awarded, but to the Yankees' costs generally, that the Yankees were entitled to these web pool costs for 2000 and 2001. He set forth the amount in his opinion, and we would submit that there's no need for it. I think maybe he doesn't want to see you all back in his courtroom again. I think that's a very good assumption, yes. So since that is an alternative finding, he's preserved the amount in his decision. We submit that there's no need for a remand on that point, that that judgment simply can be implemented. If there are no further questions, I'm happy to submit. Thank you, Ms. Detson.